Filed 3/10/16

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| ERNESTO A. SALAZAR, JR., et al., <br><br>     Plaintiffs and Appellants, <br><br> v. <br><br> ROSS MATEJCEK, <br><br>     Defendant and Appellant. | A144106 <br><br> (Mendocino County <br> Super. Ct. No. SCUK CVG 12-61053) |

Defendant Ross Matejcek appeals from the judgment of the trial court following a bench trial in which the court awarded damages associated with his encroachment on a neighboring parcel of rural property owned by plaintiffs Maria Salazar, her son Ernesto A. Salazar, Jr., and other family members. In addition to damages for encroachment, the court awarded treble damages for defendant's removal of timber and issued a mandatory injunction requiring him to restore plaintiffs' land. Plaintiffs have filed a cross-appeal raising various objections, including a challenge to the court's ruling excluding evidence of a contractor's estimate for soil remediation and the denial of their request for attorney fees. We affirm.

<h3 style="text-align:center">FACTUAL BACKGROUND AND PROCEDURAL HISTORY</h3>

*I.    The Parties and Their Properties*

In 1982, Maria Salazar and her husband Ernesto Salazar, Sr., purchased a 10-acre piece of rural property near Covelo. The property was completely undeveloped except for a small cabin. The couple resided in San Francisco and had seven children. In the

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I and IV of the Discussion section.

1980's and 1990's, the family would visit the cabin quite often during the spring and summer months for recreation. At night they would sleep in the cabin, exploring the surrounding area during the day. During the summers, they would have barbecues, go to the Eel River to swim, ride bicycles, and visit family in Covelo. Plaintiffs planned on keeping the property in the family for a long time.

When plaintiffs first purchased their land, they put a roof on the cabin but did not otherwise improve their living quarters. They wanted their children to experience a more rustic life, away from modern urban conveniences. The family enjoyed the property in its natural state and never cut down trees, cleared areas of vegetation, or put in any roads. The land includes many large trees. There is also a spring located uphill from the cabin. Plaintiffs never placed any irrigation pipes in that spring.

Dale Schatz is the former owner of defendant's 20-acre parcel, which is located downhill from, and adjacent to, plaintiffs' property. Schatz was acquainted with plaintiffs and would see them on their property during their summer visits. He allowed the children to play on his land.

When Schatz bought the property, his parcel was unimproved and there were no existing roads on it. He did not install any water lines or tap any water source. He never ran any irrigation pipes over plaintiffs' property and he never saw any such pipes running off of their property. He observed one corner of the boundary between the two properties was marked by a black plastic cross with a surveyor's stake in the middle of it. There was no road between the two properties at that time, and plaintiffs' land near their common boundary was densely forested. Defendant purchased the 20-acre property from Schatz in 2007 for $150,000.

Ms. Salazar first became aware of defendant in 2004 or 2005 when he came to the family's house in San Francisco and told her daughter he was interested in purchasing their Mendocino County property. When Ms. Salazar called defendant back, he told her he had pulled her property records at the assessor's office and knew how much she had paid for her land. He offered to buy it for $10,000. She told him the property was not for sale. He repeated that he wanted to buy it, using mannerisms that she found intimidating.

He called her about six more times after that first encounter, even though she consistently told him she was not selling.[1]  Finally, she "told him get six zeroes" and call her back, hoping this would stop his calls.  The highest price he ever offered her was $85,000, which was around 2006 or 2007.  After she learned he was going to buy Schatz's property, she offered to walk the property lines with him.  He never accepted her offer to do so.

Since the early 2000's, Ms. Salazar has noticed an increase in owners in that area using their land to grow marijuana.  Property values have gone up during this same time.  She has been told by persons who grow marijuana that her property has features that are good for marijuana cultivation because she has a water source located uphill from flat land, which allows gravity to move the water.  Defendant's land has no water and is predominantly hilly.

### A.  Plaintiffs Discover Defendant's Encroachments

At the time of trial, Ernesto A. Salazar, Jr., had been working as a merchant marine for about 14 years, which required him to be away at sea for a substantial part of the year.  He still would still make visits to the family's property.  Around late spring or early summer in 2010, he discovered defendant had done some excavation work near their common boundary line.  He noticed a gate, a fence, and a driveway, all of which appeared to be very close to his property.  After that visit, he hired Matthew Herman to conduct a survey.

Herman is a professional land surveyor.  He was hired in August 2010 to resolve the boundary between plaintiffs' and defendant's properties.  Before visiting the site, he researched property deeds as well as historical survey maps and aerial photographs.  Plaintiffs' property is roughly square in shape.  Herman was able to locate the four corners of that property and establish its four boundary lines.  He also prepared maps detailing the manner in which defendant had encroached on plaintiffs' property.

---

[1] Defendant testified he had asked Ms. Salazar about three or four times if he could purchase her property.

The first such map was prepared in October 2010. Herman noted a 424-foot-long road approximately 15 feet wide had been constructed on plaintiffs' property, accompanied by a gate and a fence. Plastic water tanks and a pool were also present on plaintiffs' land at that time. The road eventually turned back onto defendant's property. A large pond had been constructed near this area. The pond itself was not on plaintiffs' property; however, the dirt boundary of the pond did encroach onto their land. Areas had also been cleared inside of the gate and to the south of the road. Two culverts had been constructed and there were pipes near the road that extended up plaintiffs' hill. Herman returned to the property in January 2014 to investigate whether his stakes marking the boundary with defendant's property had been moved. Two of the survey stakes he set in 2010 had been moved in a southerly direction on plaintiffs' property. This transposed boundary line would have placed more of the road within defendant's parcel.

Mr. Salazar had noticed the pipes connected to a filter placed in his spring. The pipes went down to the water tanks. From the tanks, water was piped to a pool, to other tanks, and to the pond. In addition to the pipes, Mr. Salazar observed a marijuana garden growing south of the road, which was on plaintiffs' side of the property line. He removed the filter from the spring, but each time he returned to the property someone had put the filter back. This happened at least four times. On one occasion, Mr. Salazar was with Herman's surveying crew when he encountered defendant. Defendant was carrying a sidearm. He asked defendant if he always carried a gun when meeting his neighbors. Defendant offered to put the gun away. That night Mr. Salazar heard loud music, gunshots, and motorcycle engine noises coming from defendant's property.

After Mr. Salazar hired Herman to survey the property, Ms. Salazar received a threatening phone call from someone who said he was going to cut her throat from ear to ear. At the time, she did not have a dispute with anyone other than defendant. During one visit to her property, he told her he was very upset that she had brought her family with her. At that time, the gate defendant had built on her property was securely locked. Defendant had put "no trespassing" signs on the fence. He refused to give her a key to the gate. She did not get a key from him until November 2013.

4

After the survey was finalized in 2010, Ms. Salazar arranged a meeting with defendant at a restaurant in Willits. At this meeting, he told her he put the road on her property because it would have been too expensive to fill in a ravine and build a roadway on his side of the property line. Initially, he offered her $50,000 and 10 acres of his land to resolve the matter, but later he changed his mind. When she visited the property again in November 2013, she notice additional soil excavation and tree removal on her property.

Jeanette Pedersen is a retired resource manager for CalFire. Her job duties had included making site visits to see if timber had been wrongfully taken. In January 2014, she was asked to review the parties' properties. She issued a notice of violation to defendant for illegal timberland conversion on his property. She did not issue a comparable violation for the work on plaintiffs' property because CalFire does not classify road clearances as timberland conversions.

### B. *Impact of the Encroachment on Plaintiffs*

At trial, Mr. Salazar testified he is saddened by the damage done to his property and he remains nervous about visiting it. The other family members visit less frequently than before and are also fearful. The property was "quite beautiful" and "peaceful" before. The road defendant built does not benefit the family or the property in any way. Mr. Salazar testified that if he did receive an award of damages, he would use the money to restore the trees defendant had removed.

Ms. Salazar testified that the dispute with defendant has affected her physically and mentally. She has felt powerless and belittled. She has anxiety and her sleep has been affected. She does not enjoy going to the property anymore and feels as though the land was violated. She wants the road defendant built to be removed and the property restored with vegetation. She also testified that she believed the fair market value for her property was between $150,000 and $200,000. She had rented the property to a couple in the early 1990's for $600 per month. In the early 2000's she rented the property to a hunter who paid $55 per day to stay there during hunting season. She estimated the

5

current rental value of her property to be $1,200 per month, including the value of the water.

### C. Defendant's Testimony

Defendant resides in Santa Cruz. At trial he admitted he did not have the property line surveyed before building the road and did not notify Ms. Salazar about his plans. To determine the boundary, he talked to some neighbors, walked the line with a compass, and did some Internet research. He claimed the boundary marker near the gate and fence that he constructed is difficult to locate.

Defendant denied placing any pipes on plaintiffs' property. He claimed the pipes had always been there, stating he obtained water by asking the neighbor who lives above plaintiffs' property to send water through the existing pipes down to his pond. The first improvement he made after he purchased his parcel was to construct the road, which he did in the Spring of 2008. He started growing marijuana on the property that year. At the time of trial, he was leasing his land to a tenant who was growing marijuana.

## II. Restoration Cost Estimates

At trial an arborist named John Phillips testified for plaintiffs. He prepared a tree replacement plan designed to remedy the effects of defendant's encroachment. He estimated that 225 trees will need to be planted to restore the property, planted at a rate of one tree per 100 square feet. He opined planting trees without irrigation would be a waste of money because the trees would not survive. Also, the new trees would need to be fenced to keep deer and rabbits from eating them. Under his plan, someone will go to the site once a week during the first year to make sure the irrigation system is working properly. As the trees grow over time, the frequency of these visits can be reduced. After five years, the trees should be able to survive on their own without irrigation. Phillips estimated the total tree remediation cost would be $67,500. He based his labor cost estimate on a similar-sized restoration project he had done for a vineyard in Mendocino County.

Randall Jacobszoon testified for defendant. Jacobszoon is a licensed forester and owns a forestry consulting business. He works on reforestation projects and does about

6

two or three such projects per year.  He agreed with Phillips that the trees should be planted with 10-by-10-foot spacing.  Assuming that 225 trees would need to be planted, Jacobszoon would hire two people to plant all the trees in one eight-hour day, paying them $35 per hour.  The following year, he would conduct a four-hour visit to check the trees' mortality rate.  He would not fence the trees because there are many trees on the property and deer tend to eat the brush and limbs on bigger trees.  He also would not provide irrigation because trees planted correctly at the right time of year do not need irrigation.  He claimed to have achieved an 85 to 90 percent survival rate without using irrigation.  On cross-examination, he admitted he had never created a remediation plan for trees that had been damaged or destroyed.

### III.    *Procedural History*

On October 12, 2012, plaintiffs filed a complaint against defendant, alleging causes of action for quiet title, encroachment, trespass, wrongful removal of timber, and injunctive relief.

On November 4, 2014, the trial court filed its final statement of decision after the bench trial.  The court ruled in favor of plaintiffs on their quiet title claim, concluding there was no right-of-way across their property to defendant's property.  The court also found defendant had no claim or right to use any water or any portion of plaintiffs' property for any purpose.

On November 20, 2014, the trial court filed its judgment after trial.  The judgment includes an award of $39,600 for intentional and negligent encroachment.  The court also awarded damages for timber trespass, finding defendant's conduct to have been willful and malicious.  The court accordingly trebled the $67,500 award of compensatory damages for tree removal pursuant to Civil Code section 3346 and Code of Civil Procedure section 733, resulting in an award of $202,500.  As to plaintiffs' claim for injunctive relief, the court ordered defendant to remove the gate, fencing, and irrigation lines from their property.  He was further ordered to restore the roadway to its original grade, including removing the culverts and implementing erosion control measures.  He

7

was also ordered to refrain from harassing or threatening plaintiffs, and was restrained from coming within 100 yards of any plaintiff.

The trial court did not award plaintiffs punitive damages or emotional distress damages. In an amended judgment filed on February 20, 2015, plaintiffs were awarded their costs, including $16,252 in surveying fees. The court denied their request for attorney fees. The total judgment awarded, including costs, is $262,987.

## DISCUSSION

All parties have appealed from the judgment. We address the issues raised in defendant's appeal first.

### I.  *Damages for Encroachment*

In its statement of decision, the court noted defendant did not dispute that he encroached and trespassed on plaintiffs' property when he built the road, fence, and gate. There also was no dispute that he installed water tanks and a pool on their property. As to whether defendant ran irrigation lines from plaintiffs' spring to water his marijuana garden, the court discredited his testimony that he had purchased water from another neighbor using lines that were already on plaintiffs' property. While there was no evidence of the amount of water taken from plaintiffs' spring, the court found his overall conduct amply supported a verdict for plaintiffs.

In assessing damages under Civil Code section 3334,[2] the trial court used Ms. Salazar's testimony that she had rented her property for $55 a day to hunters as the measure of compensation for defendant's wrongful occupation. The court noted defendant utilized plaintiffs' land for at least two years, including obtaining water, running irrigation lines, constructing the road, fence, gate, and culverts, and installing

---

[2] Civil Code section 3334, subdivision (b) states, in part: "(1) Except as provided in paragraph (2), . . . the value of the use of the property shall be the greater of the reasonable rental value of that property or the benefits obtained by the person wrongfully occupying the property by reason of that wrongful occupation. [¶] (2) If a wrongful occupation of real property subject to this section is the result of a mistake of fact of the wrongful occupier, the value of the use of the property . . . shall be the reasonable rental value of the property."

8

water storage tanks and a pool.  Taking the sum of $55 per day multiplied over a two-year period, the court awarded plaintiffs $39,600 in damages.

Defendant contends the trial court committed legal error in awarding $39,600 as damages for encroachment.  He first asserts plaintiffs' claim is barred by the statute of limitations because the court found he built the road in 2008, placing their claim for damages outside the three-year limitations period set forth in Code of Civil Procedure section 338.  He also argues that the court's calculation of reasonable rental value was excessive and unsupported by the evidence.

As to defendant's first assertion, we agree with plaintiffs that this defense has been forfeited.  The statute of limitations for damages from an encroachment is three years.  (Code Civ. Proc., § 338, subd. (b).)  Plaintiffs filed their complaint on October 12, 2012.  In setting forth the cause of action for intentional encroachment, they alleged that "[i]n or around September of 2010, [defendant] caused a road to be built beginning on his property and encroaching upon the North section of [plaintiffs'] [p]roperty without [p]laintiffs' consent."  They also alleged that defendant "[t]herafter" caused a fence and a gate to be built on their property and installed piping and storage tanks.  In its statement of decision, the trial court did not address the temporal aspect of these allegations directly, apparently accepting defendant's testimony that he built the road in 2008.

In response to the complaint, defendant filed a general denial that includes a broadly worded affirmative defense asserting *all* of plaintiffs' claims "are barred by *all applicable statutes of limitation* contained in Code of Civil Procedure [sections] 312 [to] 366.3."  (Italics added.)  However, he failed to articulate any specific statute of limitations argument in his denial or in his pretrial statement.  As the Second District Court of Appeal observed in a similar case:  "There are two ways to properly plead a statute of limitations:  (1) allege facts showing that the action is barred, and indicating that the lateness of the action is being urged as a defense and (2) plead the specific section and subdivision.  [Citation.]  Here [the plaintiff] did neither.  She cites no authority for the proposition that raising the defense in the trial brief is sufficient.  The failure to properly plead the statute of limitations waives the defense."  (*Martin v. Van*

*Bergen* (2012) 209 Cal.App.4th 84, 91 (*Martin*).) While defendant briefly raised the statute of limitations in his closing brief (again without citing to any specific statutory provision), as with the plaintiff in *Martin,* this argument was made too late.

As to defendant's assertion that the damages awarded were excessive, he argues that because the encroachments at issue only burdened a fraction of plaintiffs' 10-acre parcel, damages based on the property's rental value should have been proportionately reduced. Whether a plaintiff "is entitled to a particular measure of damages is a question of law subject to de novo review. [Citations.] The amount of damages, on the other hand, is a fact question . . . [and] an award of damages will not be disturbed if it is supported by substantial evidence." (*Toscano v. Greene Music* (2004) 124 Cal.App.4th 685, 691 (*Toscano*).) We make " '[a]ll presumptions [that] favor the trial court's ruling, which is entitled to great deference because the trial judge, having been present at trial, necessarily is more familiar with the evidence and is bound by the more demanding test of weighing conflicting evidence rather than our standard of review under the substantial evidence rule. [Citations.] [¶] . . . [¶] . . . [W]e do not reassess the credibility of witnesses or reweigh the evidence. To the contrary, we consider the evidence in the light most favorable to the judgment, accepting every reasonable inference and resolving all conflicts in its favor.' " (*Kelly v. CB&I Constructors, Inc.* (2009) 179 Cal.App.4th 442, 452 (*Kelly*).) "The evidence is insufficient to support a damage award only when no reasonable interpretation of the record supports the figure." (*Toscano,* at p. 691.)

The trial court found $55 per day to be "the most realistic" measure of the property's value. The court further noted defendant's encroachment was significant, continuing in some respects even up to the time of verdict: "There is no dispute that Defendant utilized the property for at least 2 years. He used water from the Salazar property, ran irrigation lines over the property, built the road, fence, gate and culverts and [storage] tanks and a pool. In 2010 he abandoned the road, removed the tanks, and doughboy pool. The fencing, gate, road and irrigation lines are still in place."

We are not persuaded by defendant's argument that plaintiffs were "only ever deprived of the *use* of a fraction of an acre," referring to the land that was physically

10

occupied by his trespass. While the roadway and other encroachments existed on a discrete portion of the property, the evidence supports the trial court's finding that he ran irrigation lines across their land and made use of their water source. Because defendant's actual use of plaintiffs' property was comprehensive and involved more than just the area near the parties' boundary line, we cannot fault the trial court for awarding damages based on a rental value attributable to the property as a whole.

## II.      *Treble Damages for Trespass to Trees*

Defendant challenges the trial court's award of treble damages for trespass to plaintiffs' trees. He first asserts the court erred in awarding *any* restoration damages because there was no evidence of diminution of the property's value. However, even if defendant is correct, diminution of value is not the only measure of damages available in the context of this case.

The measure of damages for tortious injury to property, including trees, "is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." (Civ. Code, § 3333; see *Heninger v. Dunn* (1980) 101 Cal.App.3d 858, 861 (*Heninger*).) "Such damages are generally determined as the difference between the value of the property before and after the injury." (*Heninger*, at pp. 861–862.) But "[d]iminution in market value . . . is not an absolute limitation; several other theories are available to fix appropriate compensation for the plaintiff's loss." (*Id.* at p. 862.) " 'There is no fixed, inflexible rule for determining the measure of damages for injury to, or destruction of, property; whatever formula is most appropriate to compensate the injured party for the loss sustained in the particular case, will be adopted.' " (*Ibid.*) One such alternative measure of damages is the cost of restoring the property to its condition prior to the injury, and a plaintiff may recover these costs even if they exceed diminution in value if there is a "personal reason" for restoration. (*Id*. at p. 863.) At trial, plaintiffs relied on this "personal reason" exception.

The trial court found an award of restoration costs was appropriate, concluding the plaintiffs had personal reasons to have the property restored: "Plaintiffs testified that they owned the property for over 30 years. The property was used by the family as a

11

place to vacation. Maria Salazar testified that the trees were valuable to her for aesthetic reasons." The court also accepted Phillips's tree plan and found a damages award of $67,500 to be reasonable in relation to the value of the property, even assuming the entire 10-acre parcel was worth only $75,000 (representing half of what defendant paid for his 20-acre parcel in 2007).

We disagree with defendant's claim that plaintiffs did not provide substantial evidence of a personal reason to restore the trees. Plaintiffs clearly valued the property in its natural state. Over the decades, they had spent a significant amount of time on their land. Both Ms. Salazar and her son testified to the family's historic enjoyment of their land, including its many trees. Given the personal value placed on the trees by plaintiffs and the likelihood that they would restore the denuded property, the trial court's decision to award restoration costs is supported by substantial evidence.

Even when the "personal reason" exception applies, restoration costs "are allowed only if they are reasonable in light of the value of the real property before the injury and the actual damage sustained." (*Orndorff v. Christiana Community Builders* (1990) 217 Cal.App.3d 683, 690.) For example, "the owner of a unique home . . . cannot insist on its reconstruction where the cost to do so far exceeds the value of the home . . . . Nor are repair costs appropriate where only slight damage has occurred and the cost of repair is far in excess of the loss in value." (*Ibid*.) Whether the restoration costs are reasonable is a question for the trier of fact in the first instance, but an award of such costs may be unreasonable as a matter of law if it is grossly disproportionate to the value of the property or the harm caused by the defendant. (*Ibid*.; see also *Heninger, supra,* 101 Cal.App.3d at pp. 865–866.)

Defendant claims the restoration award is disproportionate because the trial court failed to consider that the area to be restored was approximately two-thirds of one acre out of the 10-acre parcel. Under the circumstances of this case, we find a holistic approach to be reasonable. Plaintiffs had never sought to develop any portion of their parcel. Maintaining their land in a natural condition was clearly important to them, both for their privacy as well as for their recreation. Due to the large amount of trees that

12

defendant removed, and the advantages they provided to plaintiffs' property as a whole, the court did not err by awarding $67,5000 in damages (prior to trebling), an amount that would restore the land to approximate its former state. (See *Heninger, supra,* 101 Cal.App.3d at pp. 864–865 [a plaintiff may recover reasonable costs of replacing destroyed trees with identical or substantially similar trees].) Any reduction in damages would have been contrary to the intent of restoration.

Finally, defendant challenges the trial court's decision to treble the restoration damages pursuant to Civil Code section 3346 and Code of Civil Procedure section 733 based on a finding that his conduct was willful and malicious.[3] While defendant's appellate brief repeatedly characterizes his encroachment on plaintiffs' property as "unintentional," he does not contest that he uprooted plaintiffs' trees. He also concedes the damages caused by his removal of the trees and undergrowth are, by law, automatically subject to doubling.[4] Instead, he challenges the trial court's award of treble damages as excessive.[5]

---

[3] "[T]he effect of [Civil Code] section 3346 as amended, read together with [Code of Civil Procedure] section 733, is that the Legislature intended, insofar as wilful and malicious trespass is concerned under either section, to leave the imposition of treble damages discretionary with the court, but to place a floor upon that discretion at double damages which must be applied whether the trespass be wilful and malicious or casual and involuntary, etc. There are now three measures of damages applicable to the pertinent types of trespass: (1) for wilful and malicious trespass the court may impose treble damages but must impose double damages; (2) for casual and involuntary trespass, etc., the court must impose double damages; and (3) for trespass under authority actual damages." (*Drewry v. Welch* (1965) 236 Cal.App.2d 159, 181, fn. & italics omitted.)

[4] Civil Code section 3346, subdivision (a) provides: "For wrongful injuries to timber, trees, or underwood upon the land of another, or removal thereof, the measure of damages is three times such sum as would compensate for the actual detriment, except that where the trespass was casual or involuntary, or that the defendant in any action brought under this section had probable cause to believe that the land on which the trespass was committed was his own or the land of the person in whose service or by whose direction the act was done, the measure of damages shall be twice the sum as would compensate for the actual detriment, and excepting further that where the wood was taken by the authority of highway officers for the purpose of repairing a public

" ' "[T]treble damages may only be awarded when the wrongdoer intentionally acted wilfully or maliciously.  The intent required is the intent to vex, harass, or annoy or injure the plaintiff.  It is a question of fact for the trial court whether or not such intent exists." [Citation.]  [Civil Code section 3346 and Code of Civil Procedure section 733] are permissive and not mandatory and while they "prescribe the degree of penalty to be invoked they commit to the sound discretion of the trial court the facts and circumstances under which it shall be invoked." ' " (*Drewry v. Welch*, *supra*, 236 Cal.App.2d at p. 172.)

At the outset, we note defendant incorrectly assumes the trial court found his encroachment to be negligent because it used reasonable rental value as the measure of damages for encroachment.  Reasonable rental value can be the measure of damages for negligent encroachment under Civil Code section 3334, subdivision (b)(2); however, the court's statement of decision does not reflect that it made any finding as to negligence.

We note there was testimony indicating defendant had pulled plaintiffs' property records from the assessor's office before he made multiple attempts to purchase their parcel, suggesting he was familiar with the property's boundary lines even before he purchased his own parcel.  In spite of this familiarity, he elected to forego obtaining a formal survey before destroying an estimated 225 trees to build the road and clear the surrounding area to house his water storage devices.  The evidence also suggests that visible boundary markers were present at the site.  Further, defendant also deliberately chose not to notify plaintiffs of his construction plans.  At trial, he justified this failure by stating Ms. Salazar had always been unpleasant to him.  Yet her attitude did not stop him

highway or bridge upon the land or adjoining it, in which case judgment shall only be given in a sum equal to the actual detriment."

[5] Code of Civil Procedure section 733 provides: "Any person who cuts down or carries off any wood or underwood, tree, or timber, or girdles or otherwise injures any tree or timber on the land of another person, or on the street or highway in front of any person's house, village, or city lot, or cultivated ground; or on the commons or public grounds of any city or town, or on the street or highway in front thereof, without lawful authority, is liable to the owner of such land, or to such city or town, for treble the amount of damages which may be assessed therefor, in a civil action, in any court having jurisdiction."

14

from contacting her multiple times when he was first seeking to acquire her land. Moreover, even after he became aware of his trespass he reportedly refused to give Ms. Salazar the key to the gate until after this lawsuit was filed. All of the above factors support a finding that defendant acted with deliberate indifference to the rights of plaintiffs. We conclude the trial court did not abuse its discretion in trebling the damage award.

### III. *Injunctive Relief to Restore the Roadway*

The trial court granted plaintiffs' request for injunctive relief as prayed for in the complaint under the second cause of action, ordering defendant to remove the gate, fencing and irrigation lines, and to restore the roadway to its original grade. With respect to the roadway, the judgment awards injunctive relief compelling defendant to "restore the roadway on Plaintiffs' property to its original grade, in a substantial and workman like manner, and in compliance with any and all applicable Government regulations and permitting process, including but not limited to removing the two culverts that are either totally or partially on Plaintiffs' property, and implementing erosion control measures." On appeal, defendant asserts plaintiffs did not properly plead a claim for injunctive relief to restore the roadway and that, even if they did, they made an election to pursue monetary damages at trial. He also claims there was no evidence to support the court's order.

"The grant or denial of a permanent injunction rests within the trial court's sound discretion and will not be disturbed on appeal absent a showing of a clear abuse of discretion. [Citation.] The exercise of discretion must be supported by the evidence and, 'to the extent the trial court had to review the evidence to resolve disputed factual issues, and draw inferences from the presented facts, [we] review such factual findings under a substantial evidence standard.' " (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 390.) A trial court's discretionary "ruling 'will be sustained on review unless it falls outside the bounds of reason.' [Citation.] We could therefore disagree with the trial court's conclusion, but if the trial court's conclusion was a reasonable exercise of its discretion, we are not free to substitute our discretion for that

15

of the trial court." (*Avant! Corp. v. Superior Court* (2000) 79 Cal.App.4th 876, 881–882.)

### A. Plaintiffs Pleaded a Cause of Action for Injunctive Relief

" 'A permanent injunction is an equitable remedy for certain torts or wrongful acts of a defendant where a damage remedy is inadequate. A permanent injunction is a determination on the merits that a plaintiff has prevailed on a cause of action for tort or other wrongful act against a defendant and that equitable relief is appropriate. . . .' " (*Benasra v. Mitchell Silberberg & Knupp* (2002) 96 Cal.App.4th 96, 110.) To properly plead facts for injunctive relief, the complaint must plead (1) the elements of a cause of action involving the wrongful act sought to be enjoined and (2) "[t]he grounds for equitable relief of this kind, i.e., a showing of inadequacy of the remedy at law." (5 Witkin, Cal. Procedure (5th ed. 2010) Pleading, § 823.)

Defendant asserts the complaint's prayer for relief is inconsistent with its allegations and contends that the legal basis for mandatory injunctive relief was not pleaded. The question of whether plaintiffs have pleaded a cause of action for a mandatory injunction (see Code Civ. Proc., § 526) is not properly before us because "[if] the pleadings are insufficient, the defect may be raised by demurrer or motion to strike, or by motion for judgment on the pleadings," but not by appeal from the final judgment. (*Coyne v. Krempels* (1950) 36 Cal.2d 257, 262 [deficient pleadings cannot be challenged by motion for summary judgment].)

Regardless, we are not persuaded by defendant's argument. It is true that a party cannot recover on a cause of action not pleaded in the complaint. (*Griffin Dewatering Corp. v. Northern Ins. Co. of New York* (2009) 176 Cal.App.4th 172, 179 (*Griffin*).) In *Griffin,* the plaintiff could not recover damages on an oral contract that was made after the written contract alleged in the complaint. (*Ibid.*) In this case, however, plaintiffs did not receive damages or injunctive relief for any cause of action not stated in the complaint.

In setting forth the second cause of action's claim for intentional encroachment, plaintiffs alleged that "[u]nless [defendant] is compelled to remove the encroachment

16

from Plaintiffs' land, Plaintiffs will suffer irreparable injury in that a continuation of the encroachment will ripen into a prescriptive easement." The prayer for relief for the second cause of action specifically requests "a permanent injunction compelling defendants *to remove* from the Salazar Property *the encroachments* described in this complaint *and to restore the property to plaintiffs' use and enjoyment*." (Italics added.) Plaintiffs thus pleaded grounds upon which equitable relief could be justified by alleging defendant's wrongful acts constituted an actual or threatened injury to their property rights that could not be compensated by an ordinary damage award. They therefore satisfactorily alleged the legal basis for mandatory injunctive relief, and we do not perceive any fatal inconsistency between the allegations and the prayer for relief. (See, e.g., *Erskine v. Upham* (1942) 56 Cal.App.2d 235, 248. ["[W]hen a party comes into a court of equity pleading facts which entitle him to some equitable relief, . . . notwithstanding the form of the pleading, [the court] will disregard the specific prayers in order to grant the relief which the proof warrants as within the equities of the entire case"].)

While the trial court did not explicitly state the legal basis for its ruling, the evidence was uncontradicted that the excavated area could not be successfully replanted without some type of soil remediation. In the absence of such remediation, plaintiffs will be unable to carry out the tree plan prepared by Phillips, thwarting the very purpose of awarding these restoration damages. The trial court had the authority to fashion an equitable remedy appropriate to the circumstances of this case. It is well established that "a court called upon to afford relief historically or analytically equitable in its nature 'has broad powers to fashion a remedy. [Citation.] It may create new remedies to deal with novel factual situations.' " (*Dawson v. East Side Union High School Dist.* (1994) 28 Cal.App.4th 998, 1040.)

Evidence was presented as to the original condition of this portion of the property with respect to its soil and gradation. Phillips testified that part of the road had been cut through a slope. He opined that trees can only be planted in areas where there is soil, and that there was no soil on the roadway. Also, the uphill side and the downhill slope

17

abutting the road could not be planted "until it would be changed." He also indicated that the area disturbed by the road and culverts would need improvement to create more normal soil conditions. Soil was removed to build the road, the surface of which is compacted, consisting mostly of rock or very compact soil. The new trees would need to be planted in a more porous type of soil to ensure an acceptable survival rate.

### B. Election of Remedies

Defendant claims injunctive relief is improper because plaintiffs elected to pursue the remedy of damages at trial, noting the trial court granted his motion in limine to prevent Phillips from testifying about an estimate of the cost of importing soil and grading the ground that had been prepared by a soil contractor named John Green.[6] Under the circumstances of this case, we reject defendant's contention that plaintiffs elected, or were required to have elected, money damages as their remedy.

In an action between adjoining landowners, when the defendant without privilege occupies the plaintiff's property, an injunction may be granted to remove the encroachment. (*Phillips v. Isham* (1952) 111 Cal.App.2d 537, 539–540.) " '[W]here the encroachment does not irreparably injure the plaintiff, was innocently made, and where the cost of removal would be great compared to the inconvenience caused plaintiff by the continuance of the encroachment, the equity court may, in its discretion, deny the injunction and compel the plaintiff to accept damages.' " (*Brown Derby Hollywood Corp. v. Hatton* (1964) 61 Cal.2d 855, 858 (*Brown Derby*), citing *Christensen v. Tucker* (1952) 114 Cal.App.2d 554, 559.) "When the court finds, however, that there is [irreparable] injury *or that the defendant was not innocent,* it should grant an injunction." (*Brown Derby,* at p. 858, italics added.) Where the conduct is willful, it may be presumed that a defendant acted with full knowledge of the plaintiff's rights " 'and with an understanding of the consequences which might ensue . . . .' " (*Warsaw v. Chicago*

---

[6] It appears Phillips obtained this soil estimate from Green. At his deposition, however, Phillips admitted he was not qualified to testify on the subject of regrading, soil replacement, and compaction. Defendant successfully objected to the introduction of Green's estimate on hearsay grounds.

*Metallic Ceilings, Inc.* (1984) 35 Cal.3d 564, 573.)  As noted above, there was ample evidence that defendant's encroachment onto plaintiffs' land was intentional.  In sum, we conclude the trial court did not abuse its discretion in issuing a mandatory injunction requiring defendant to return the roadway area to its original grade.[7]

## IV.    *Plaintiffs' Cross-appeal*

Plaintiffs have cross-appealed from the trial court's ruling that prevented Phillips from introducing Green's repair estimate for returning the roadway to its natural grade.  They also take exception to the court's conclusion that emotional distress damages are not recoverable because they were not pleaded in a separate cause of action.  They further contest the court's decision to limit encroachment damages to two years of rental value.

### A.  *Exclusion of Excavation Contractor's Estimate*

As noted above, the trial court granted defendant's motion in limine to exclude evidence of Green's $95,000 estimate for soil remediation.  Plaintiffs assert this ruling was made in error.

"While an expert may state on direct examination the matters on which he relied in forming his opinion, he may not testify as to the details of such matters if they are otherwise inadmissible.  [Citations.]  The rule rests on the rationale that while an expert may give reasons on direct examination for his opinions, including the matters he considered in forming them, he may not under the guise of reasons bring before the jury incompetent hearsay evidence."  (*Grimshaw v. Ford Motor Co.* (1981) 119 Cal.App.3d 757, 788–789, cited with approval in *People v. Coleman* (1985) 38 Cal.3d 69, 92.)[8]

An expert may not relay hearsay as independent proof of a fact.  (*Korsak v. Atlas*

---

[7] Defendant contends the trial court's injunction leaves him "without any guidelines or limitation as to cost, timelines, procedures or oversight from the [trial court]."  Defendant does not set forth any rule of law that prohibits him from seeking further guidance from the court below.

[8] Plaintiff's reliance on *Appel v. Burman* (1984) 159 Cal.App.3d 1209 (*Appel*), is misplaced.  As noted in *Continental Airlines, Inc. v. McDonnell Douglas Corp.* (1989) 216 Cal.App.3d 388, 414, fn. 14, "*Appel* predates *People v. Coleman, supra,* 38 Cal.3d 69, and to the extent its holding conflicts with *Coleman,* it is simply not California law."

*Hotels, Inc.* (1992) 2 Cal.App.4th 1516, 1524–1525.) A trial court's ruling regarding the admissibility of this hearsay is accordingly reviewed for abuse of discretion. (*People v. Valdez* (1997) 58 Cal.App.4th 494, 511; see also *People v. Waidla* (2000) 22 Cal.4th 690, 723 ["an appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence"].)

Here, Phillips admitted he had no expertise in soil excavation. Thus, he could not have relied on Green's estimate in forming his own expert opinions. Therefore, the trial court did not abuse its discretion in prohibiting him from testifying as to this estimate.[9]

### B. Award of Two Years of Rental Value for Encroachment Damages

The trial court based its award of damages for encroachment, in part, on the fact that "there is no dispute that Defendant utilized the property for at least 2 years." In their closing brief, plaintiffs requested five years of rental value for the years 2008 to 2012 at a rate of $14,400 per year, for a total of $72,000. Defendant countered that he had actively occupied the property from 2008 to 2010 only. Plaintiffs do not appear to contest that he removed the water storage devices and ceased using the road in 2010. However, the gate, fence, culverts, and roadway remained, and plaintiffs assert the court mistakenly focused on defendant's personal occupation and not on the physical encroachments.

Plaintiffs' challenge is to the adequacy of the rental amount awarded, not the measure of damages of $55 per day that the trial court adopted. Their argument was therefore forfeited by their failure to move for a new trial on damages. It is settled that a plaintiff who has not sought a new trial cannot argue inadequacy of damages on appeal if the challenge turns on the credibility of witnesses, conflicting evidence, or other factual questions. (*Schroeder v. Auto Driveaway Co.* (1974) 11 Cal.3d 908, 918, fn. 6; *Glendale Fed. Sav. & Loan Assn. v. Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101, 122

---

[9] Plaintiffs assert the proper remedy at trial was not to exclude the estimate entirely based on hearsay, but to allow it to be presented subject to defendant's cross-examination or refutation by his own expert. We disagree. Nothing prohibited plaintiffs from designating Green as an expert witness in soil excavation and obtaining direct testimony as to his cost estimate.

[stated rule applies whether the case was tried by a jury or a court without a jury];
*Mendoyoma, Inc. v. County of Mendocino* (1970) 8 Cal.App.3d 873, 877–878.)
Computation of fair rental value of a property necessarily depends on the facts of the
particular case. (*Cassinos v. Union Oil Co.* (1993) 14 Cal.App.4th 1770, 1785.) We
need not further address this argument.

### C. Denial of Emotional Distress Damages for Trespass Cause of Action

In their cause of action for trespass, plaintiffs alleged they "have suffered
discomfort and annoyance and experienced mental suffering caused by fear for their
safety from [defendant] and others who have brandished guns and uttered threats toward
anyone questioning their right to trespass on the Salazar Property." Plaintiffs claim the
trial court applied the wrong legal standards in denying emotional distress damages on
their trespass cause of action. The court determined they could not recover damages for
"annoyance and discomfort" because they did not reside on the property. The court also
found they were not entitled to emotional distress damages because they failed to plead a
separate cause of action for emotional distress. We find no error.

The trial court's statement of decision relies on *Kelly, supra,* 179 Cal.App.4th 442,
a case that notes damages for annoyance and discomfort resulting from trespass to
property are intended to compensate the person occupying the property for interference
with use and enjoyment. (*Kelly*, at pp. 456–459.) In *Kelly,* a fire damaged or destroyed
several structures on the plaintiff's real property. Mudslides later destroyed another
structure and caused extensive damage to the land itself. Although the plaintiff owned
the real property, he was not living there at the time of the fire and mudslides. Moreover,
the plaintiff had rented the property and structures to other people and they actually
occupied the property at the time the fire and mudslides occurred. (*Id.* at pp. 447–448.)
The *Kelly* court held that damages for annoyance and discomfort can only be awarded if
the plaintiff actually occupied the property, i.e., was physically living on the property at
the time trespass and resulting injury occurred. (*Id.* at pp. 456–459.)

In this case, the evidence is undisputed that plaintiffs used their property only as a
vacation spot. While they may have made occasional visits after 2007, they were not

21

personally occupying the property at the time pertinent to their trespass claims. Therefore, they are not legally entitled to recover damages for annoyance and discomfort caused by the trespass. Significantly, even in their claim for trespass, plaintiffs did not allege that the physical trespass itself was the source of their emotional distress. Rather, the complaint alleged that defendant's intimidating conduct caused them emotional distress. " '[T]he "annoyance and discomfort" for which damages may be recovered on nuisance and trespass claims generally refers to distress arising out of physical discomfort, irritation, or inconvenience caused by odors, pests, noise, and the like. [Citations.] . . . . [¶] Our cases have permitted recovery for annoyance and discomfort damages on nuisance and trespass claims while at the same time precluding recovery for "pure" emotional distress.' " (*Kelly, supra,* 179 Cal.App.4th at pp. 456–457, citing to *Webster v. Boone* (Colo.Ct.App. 1999) 992 P.2d 1183, 1185–1186.) As the trial court noted, plaintiffs did not plead a separate cause of action for emotional distress. Accordingly, there is no basis upon which plaintiffs would be entitled to an award for the mental distress they experienced in connection with defendant's conduct.

### D. *Failure to Award Punitive Damages*

The trial court declined to make a separate award for punitive damages, concluding that the award of treble damages for the removal of trees was sufficient to address the wrongful nature of defendant's conduct. In their complaint, plaintiffs asserted a claim for punitive damages in their third cause of action for trespass, alleging defendant's conduct was willful and malicious, and was undertaken in conscious disregard of their physical safety and well-being. Plaintiffs assert they are entitled to a determination as to whether his trespass, apart from the timber removal, was oppressive.

"Whether to award punitive damages if the requirements of Civil Code section 3294, subdivision (a) are satisfied and the amount of such an award are questions committed to the trier of fact." (*Uzyel v. Kadisha* (2010) 188 Cal.App.4th 866, 923–924.) A plaintiff is never entitled to punitive damages as a matter of right, not even " '[u]pon the clearest proof of malice in fact.' " (*Brewer v. Second Baptist Church* (1948) 32 Cal.2d 791, 801 (*Brewer*); accord *Sumpter v. Matteson* (2008) 158 Cal.App.4th 928,

930 (*Sumpter*).) A plaintiff, " 'upon establishing his case, is always entitled of right to compensatory damages. But even after establishing a case where punitive damages are permissible, he is never entitled to them. The granting or withholding of the award of punitive damages is wholly within the control of the jury . . . .' " (*Brewer,* at p. 801; accord *Sumpter,* at p. 936.)

Because the trier of fact's decision regarding whether to award punitive damages is a discretionary decision, we review the trial court's decision here for abuse of discretion. (*Brewer, supra,* 32 Cal.2d at p. 801.) In performing our review we are mindful that "[i]t should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." (*State Farm Mut. Automobile Ins. Co. v. Campbell* (2003) 538 U.S. 408, 419; *Ferguson v. Lieff, Cabraser, Heimann & Bernstein* (2003) 30 Cal.4th 1037, 1051.) Here, the trial court exercised its discretion to decline awarding punitive damages to plaintiffs. It was entitled to conclude the award of treble damages for the removal of plaintiffs' trees was sufficient to punish defendant for all aspects of his wrongful conduct.

### E.  *Plaintiffs' Claim for Attorney Fees*

Plaintiffs assert attorney fees are recoverable as "costs . . . of recovering . . . possession" under Civil Code section 3334, subdivision (a). That section provides, in part: "The detriment caused by the wrongful occupation of real property . . . is deemed to include the value of the use of the property for the time of that wrongful occupation . . . and the costs, if any, of recovering the possession." (Civ. Code, § 3334, subd. (a).) In an amended judgment filed February 20, 2015, the trial court noted that the parties had agreed to address entitlement to attorney fees in plaintiffs' memorandum of costs, with defendant thereafter filing a motion to tax costs. The court found attorney fees were not recoverable and struck the $80,030 of attorney fees claimed in the memorandum. We reject plaintiffs' argument that attorney fees are awardable under this provision. "Statutory attorney fee awards must be *specifically* authorized by a statute." (*That v.*

23

*Alders Maintenance Assn.* (2012) 206 Cal.App.4th 1419, 1428, fn. omitted [rejecting request to construe statute to include attorney fees within authorized costs].)

## DISPOSITION

The judgment is affirmed.  The parties are to bear their own costs on appeal.

_____
DONDERO, J.

We concur:


_____
MARGULIES, Acting P.J.


_____
BANKE, J.

25

A144106

| | |
|---|---|
| Trial Court | Mendocino County Superior Court |
| Trial Judge | Hon. Jeanine Nadel |
| Counsel for Plaintiffs and Appellants Ernesto A. Salazar, Jr., et al. | Carter, Momsen & Knight, PC Brian S. Momsen Alexander C. Rich |
| Counsel for Defendant and Appellant Ross Matejcek | Brigham Law Office Thomas S. Brigham Brooke A. Brigham |